OLD MISSION PORTLAND CEMENT COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 38853.   Promulgated January 21, 1932.

*George E. H. Goodner, Esq.,* and *Frederick C. Rohwerder, C. P. A.,* for the petitioner.

*J. A. Adams, Esq.,* for the respondent.

## OPINION.

Smith: The principal issue for our determination is the fair market value of the petitioner's limestone deposits, designated as the Barbee, Underwood, and Flint deposits, on March 1, 1913, which the petitioner acquired prior to that date in the manner set forth in our findings of fact. The facts relating to the acquisition of these properties are not in dispute, and the petitioner concedes the correctness of the respondent's determination of the estimated tonnage on the basic date. The respondent determined the March 1, 1913, value of these deposits to be $63,121, estimated the tonnage thereof at 1,700,000 tons, and allowed depletion deductions at the rate of 3.713 cents per ton upon the stone removed during the taxable years 1923 to 1926, inclusive. The petitioner claimed deductions for depletion upon its income-tax returns for the taxable years under consideration at the rate of 20 cents per ton, which rate is explained on brief as " a charge spread over all its holdings and was not restricted to the Barbee, Underwood and Flint deposits." The petitioner contends that the March 1, 1913, value of these deposits was not less than $1 per ton, and in support of this valuation offered opinion evidence by three men experienced in the cement industry.

The petitioner's first witness, Ira Judson Coe, testified that he had been interested in California limestone properties since 1903 and that as a consulting engineer he had examined practically all such deposits in that State. Between 1904 and 1906 he examined the properties involved in this proceeding, and, finding them suitable for cement production, recommended operations thereon. On direct examination Coe stated that in 1906 he valued the limestone in place on these properties at $1,000,000, and later stated that he probably did not place a valuation upon the properties at that time, but made a recommendation as to " the value, or I would not have recommended the investment." The interests that he represented put about $300,000 into the development of these properties at that

time, and, according to Coe, a total of about $1,300,000 was expended for the construction of the cement plant and the development of the properties before 1913. From a consideration of all of his testimony it is difficult to determine whether he valued the properties at $1,000,000 in 1906 or merely found that they were of such a nature as to warrant an investment of $1,000,000. In 1905 or 1906 he procured an option on the Sky Blue Marble Quarries near Riverside and Los Angeles, California, for the Henshaw Brothers. In making his examination of these properties Coe made 23 diamond drill holes and tunneled the deposits to determine the tonnage, which he estimated at 2,000,000 tons. He recommended the construction of a cement plant and the operation of the Sky Blue properties. The option was exercised and the Sky Blue properties acquired for $55,000 and turned over to the Riverside Portland Cement Company. Coe stated that the Riverside plant for the operation of the Sky Blue properties cost about $1,000,000 and was about the same as the plant which was started in 1906 by the San Juan Portland Cement Company for the operation of the Barbee, Underwood, and Flint deposits. Shortly before the hearing in this proceeding in February, 1931, Coe computed the March 1, 1913, value of the Barbee, Underwood, and Flint deposits, which he estimated at 2,000,000 tons, by the use of figures on the estimated (not actual) cost of 82½ cents for manufacturing a barrel of cement at the Riverside plant in 1906, a selling price of $1.50 per barrel for the cement, an estimated gross profit of 67½ cents per barrel of cement or $2.16 per ton of raw material, or a total estimated gross profit of $4,320,000. The remainder of his computation is as follows:

Present value of deposits based on 10 year life and discount factors of 8% and 4% (Hoskold's Table) before deducting cost of plant, $4,320,000. × .6124 _____ $2,645,568

Deduct:
    Estimated cost of plant _____ 1,000,000

Total value of deposits _____ $1,645,568

Value of deposits, per ton _____ $0.822784

Coe did not value the particular properties with which we are here concerned either in 1906 or 1913, and his testimony shows no familiarity with these properties at or near the basic date. In fact, he has not examined these properties since 1907. His computation based on the Riverside properties might have more probative value if the comparison had been based upon actual instead of estimated costs of manufacturing cement. Coe stated that there was not much change in the value of limestone deposits in California between 1906 and 1913 and that any value determined in 1906 would hold

good in 1913, and yet he stated that the Sky Blue properties, with the same estimate tonnage as the Barbee, Underwood, and Flint properties, cost only $55,000 in 1906. At that time both properties were undeveloped and may be considered comparable.

Herbert Coffman, petitioner's second witness, has had about 30 years experience in the cement industry as a chemist and executive officer. His first contact with the petitioner's properties was in 1916, when he made an analysis of some samples of the limestone in these deposits. Between 1907 and 1914 Coffman was chief chemist for the Riverside Portland Cement Company. He stated that the petitioner's properties could have been as successfully operated as the Riverside properties, that the Riverside Company made a profit of $1.815 per ton before deducting depreciation at the rate of 25 cents a ton, or a profit of $1.565 per ton of raw material, and that the limestone in place was worth at least one-half of this amount, or 78 cents per ton. On cross-examination it was shown that Coffman did not know the methods used in computing costs or the actual profit per ton at the Riverside plant, and that he had never checked the figures as to costs in the cement industry. His opinion of value was based upon assumptions of plant costs, depreciation, cost of manufacturing and selling price of cement, and not actual costs at the Riverside plant.

F. S. Richards, petitioner's third witness, has had many years of experience in the cement industry in the United States and Australia, but had never seen the properties involved in this proceeding until 1923. His testimony was based entirely upon an historical study of conditions in the cement industry in California, and not upon actual experience and observation of conditions at or near the basic date. Richards studied the records of the petitioner's operations after production was begun in 1918, from which he computed a value for the limestone deposits with which we are here concerned. He stated that the valuation so determined as of 1918 would be the same as the valuation as of March 1, 1913, since there were no operations on these properties between 1913 and 1918, and the general state of the cement industry during that period would not affect the valuation. Although he detailed much information about the development and use of cement in California building construction following the San Francisco earthquake, the impetus to the development of that section by the opening of the Panama Canal, transportation costs and differentials in freight charges, etc., he failed to mention the effect, if any, of conditions produced by the World War on the cement industry and particularly upon the value of petitioner's limestone deposits. Even assuming, but not deciding, that his valuation as of 1918 was correct, that valuation should be dis-

counted by reason of the unusual conditions tending toward inflated values then prevailing. Cf. *Bogle & Co.* v. *Commissioner*, 26 Fed. (2d) 771, 772.

Richards testified that it is difficult to determine the actual tonnage of a limestone deposit in California, due to the lay of the rock, the strata of which may have been disrupted by physical changes in the land, and, further, that no estimate of the tonnage in a deposit is worth anything until it is backed up by definite prospect work. Although he did not explain just what he meant by "definite prospect work," neither his testimony nor that of the other witnesses reveals a definite prospecting of the deposits involved in this proceeding at or near the basic date, or at any other time. The first witnesses used an estimated tonnage of 2,000,000 tons, while Richards used the respondent's determination of 1,700,000 tons in computing valuation. Shortly before the hearing, Richards prepared a statement showing the total tonnage removed from the Barbee, Underwood, and Flint deposits to be 1,700,000 tons, and the revenue for the years 1918 to 1928, inclusive, before depletion and depreciation in the amount of $3,715,959.42, to which he applied "Discount factor Hoskold's 8 & 4 for 11 years .589748," in determining a discounted value of $2,191,-479.62, "Less one-half of plant cost and improvements $675,059.79," or a net valuation of $1,516,419.83 for these deposits. This last sum divided by 1,700,000 tons, Richards stated gave the limestone in place a value of 89.2 cents per ton. It is to be noted that this valuation is based upon revenue derived from these deposits during the postwar period and not upon expected profits estimated prior to operations (see *Reinecke* v. *Spalding*, 280 U. S. 227, *in re* discounting revenue to arrive at a March 1, 1913, value for depletion purposes). This witness did not know of any sales of limestone properties in the United States on the basis of a computation by Hoskold's formula discounting expected profits from the sale of manufactured cement. Although Richards computes a value of 89.2 cents per ton for the limestone in these deposits as of 1918, which he states would be the same value in 1913, he also tells us that in 1920 and 1921 the petitioner purchased limestone rock in place for 10 cents a ton and acquired a lease in 1927 for quarrying limestone at a royalty of 10 cents a ton. Such sales in 1920 and 1921 are not consistent with a 1918 valuation of 89.2 cents per ton, even after considering possible factors such as quarrying and transportation conditions and the available tonnage, etc.

On brief the petitioner argues that the testimony of these witnesses overcomes the *prima facie* correctness of the respondent's determination and that this evidence supports a valuation of approximately $1

per ton, citing *Russell* v. *Commissioner*, 45 Fed. (2d) 100, wherein the Circuit Court of Appeals for the First Circuit said:

While there is a presumption that the Commissioner's findings are correct, *Avery* v. *Commissioner* (C. C. A.) 22 F. (2d) 6, 55 A. L. R. 1277, when it appears, as in this record it does appear, that the methods pursued by the Commissioner were mathematically and legally erroneous, that presumption no longer avails. *New York Life Ins. Co.* v. *Ross* (C. C. A.) 30 F. (2d) 80, 82.

There is no contention here that the respondent's determination of the depletion deductions is mathematically erroneous and we do not think that the record shows that determination to be legally erroneous. The only evidence offered by the petitioner to refute the respondent's determination is the opinion testimony of these witnesses, which has been carefully considered. Such evidence is entitled to consideration, but, as the Circuit Court of Appeals for the Sixth Circuit said in a recent decision, *Tracy* v. *Commissioner*, 53 Fed. (2d) 575, affirming our decision at 15 B. T. A. 1107:
B. T. A. 1107:

* * * while the opinions of experts are competent and often very helpful, such evidence is not considered binding upon the tribunal before which it is produced, at least not to the extent that such tribunal is bound to follow it if contrary to the best judgment of its members. *Anchor Co.* v. *Commissioner*, 42 F. (2d) 99 (C. C. A. 4); *Am-Plus Storage Battery Co.* v. *Commissioner*, 35 F. (2d) 167 (C. C. A. 7). * * *

In *Anchor Co.* v. *Commissioner*, 42 Fed. (2d) 99, is the following:

* * * Such evidence is competent, but it is not to be blindly followed. It should be weighed by the Board in the light of the other facts developed in the case and of the general knowledge and experience of the members, and is by them to be given only such weight as in the light thereof may seem to be just and reasonable. *The Conqueror*, 166 U. S. 110, 131, * * *; *Head* v. *Hargrave*, 105 U. S. 45, 49 * * *; *Am-Plus Storage Battery Co.* v. *Commissioner* (C. C. A. 7th) 35 F. (2d) 167, 169.

See also *Balaban & Katz Corporation* v. *Commissioner* (C. C. A., 7th Cir.), 30 Fed. (2d) 807; *Am-Plus Storage Battery Co.* v. *Commissioner*, 35 Fed. (2d) 167; *H. H. Blumenthal*, 21 B. T. A. 901.

The record is not clear as to whether witness Coe valued the properties in question in 1906 or 1913, or in both of these years. The valuations of the other witnesses were made approximately 18 years after the basic date with which we are here concerned. The March 1, 1913, fair market value of these limestone deposits must be determined in the light of facts then known or then reasonably to be anticipated. *J. J. White Lumber Co.*, 24 B. T. A. 274. None of the witnesses has adequately shown a knowledge of the petitioner's limestone deposits on or about the basic date to support his valuation. Each testified to a retrospective valuation which is doubtless " colored by subsequent prosperity " of the cement industry. *Bogle*

*& Co. v. Commissioner, supra.* As we said in *E. Louis Jacobs,* 20 B. T. A. 529, 535: " * * * The longer the period which has elapsed since the date as of which value is expressed, the less reliable is the opinion of value likely to be."

It was within the province of the petitioner to show its actual investment in these properties, which would or would not support the claimed valuation. The allowance for depletion is, after all, a return of capital arising out of a gradual sale of the properties. *Lisk Manufacturing Co., Ltd.,* 15 B. T. A. 1048; *United States* v. *Ludey,* 274 U. S. 295. The undisputed facts of record show that these properties, together with a partially completed cement plant and the large acreage designated as the Chittenden Ranch, were acquired in 1912 by the petitioner in exchange for its stock of the par value of $1,700,000, but no value has been established for this stock and no attempt has been made to allocate such value to the several properties so acquired. Such facts would aid our determination. The information submitted in connection with Form F filed with the Commissioner in 1922, in substantiation of petitioner's increase of its claimed depletion deductions from 10 cents to 20 cents per ton, does not support the valuation now claimed by the petitioner. It is to be noted that the estimates and computations submitted in connection with Form F are based upon the tonnage requirements of the mill at its 1922 capacity. There is nothing in this data that shows with any degree of certainty the relevent facts known or reasonably anticipated at or near the basic date with which we are concerned.

The determination of the fair market value of any property is largely a matter of judgment and various theories of valuation are useful, only so far as they support a result consonant with sound judgment. *Portage Silica Co.,* 11 B. T. A. 700, 705; affd., 49 Fed. (2d) 985. The theoretical computations of witnesses Coe and Coffman, based upon 1906 estimates of cost and selling price, and the theoretical computation of witness Richards, based upon revenue produced by these deposits, which were discounted by Hoskold's formula, with varying results, do not, in our opinion, establish the fair market value of these properties as of the basic date. As the Circuit Court of Appeals for the Ninth Circuit said in *Simons Brick Co.* v. *Commissioner,* 45 Fed. (2d) 57, 58 (certiorari denied, 283 U. S. 834):

* * * whatever the value of this [Hoskold's] formula may be in cases where there is no other evidence of the value of deposits of minerals, etc., in place, and where the necessary factors are more clearly proved than in this case, this is not a case for its application. Here there is other evidence of a definite character as to the actual value of the clay lands on March 1, 1913 * * *.

Upon a consideration of all of the evidence, we are of the opinion that the respondent's determination of the March 1, 1913, value of the petitioner's limestone deposits and his allowances for depletion should not be disturbed.

The next issue is the deductibility of certain amounts designated as " contributions, subscriptions, or donations." This opinion would be inordinately prolonged by a discussion of and decision on each of the enumerated items set forth in our findings of fact. Suffice it to say that such items are deductible or not, when considered in the light of the facts of each case, upon the application of the general principle that " the question always is whether, balancing the outlay against the benefits to be reasonably expected, the business interest of the taxpayer will be advanced." See *American Rolling Mill Co.* v. *Commissioner*, 41 Fed. (2d) 314, 315, for a fuller discussion and citation of authorities. See also *Yamhill Electric Co.*, 20 B. T. A. 1232.

Applying this principle to the items in controversy, we hold that items 2, 4, 5, 7, 10, 13, 16, 18, 23, 26, 28, 30, 31, 33, 36, 37, 38, 41, 47, 50, 54, 58, 68, 82, and 84 are deductible; and that items 1, 6, 8, 9, 12, 14, 15, 20, 21, 24, 27, 29, 32, 34, 35, 42, 43, 44, 46, 51, 52, 55, 59, 74, 80, and 83 are not deductible. No evidence was offered regarding items 3, 11, 17, 19, 22, 25, 39, 40, 45, 48, 49, 53, 56, 57, 60 to 67, inclusive, 69 to 73, inclusive, 75 to 79, inclusive, 81, 85, 86, and 87, and the respondent's disallowance of same is approved.

In view of the petitioner's method of handling contributions of cement upon its books, no adjustment of the allowed items representing contributions of cement is necessary, since the credit of the full amount to sales is offset by the allowed deduction. However, the disallowed deductions representing contributions of cement require an adjustment by eliminating the profit upon this cement which has been credited to sales and erroneously included in gross income.

At the hearing, counsel for the respondent conceded error as alleged in the third issue and stipulated that petitioner's gross income had been overstated by the amount of $3,769.57.

The remaining issue is whether the amount of the amortization of bond discount on the bonds of the petitioner's affiliate, the California Central Railroad Company, held by the petitioner during the taxable years under consideration is deductible in computing the consolidated net income of the affiliated corporations for these years. The facts of record do not distinguish the situation here presented from that ruled upon in *New Orleans, Texas & Mexico Ry. Co.*, 6 B. T. A. 436, 441, wherein we held that such bond discount was not deductible. Following that decision, the respondent's action in this particular

is sustained. See also *Gulf, Mobile & Northern R. R. Co.*, 22 B. T. A. 233, 261, wherein we followed our earlier decision on this point.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

GOODRICH dissents.

---

MURDOCK, dissenting: I believe that a correct result has been reached in the prevailing opinion on the first and last points, but I do not agree that the other issue has been decided properly. The findings of fact indicate that there is insufficient evidence as to many of the items in controversy to determine whether or not they are deductible. Where the petitioner gave away cement of its own manufacture, it did not make sales, and it should not have included the market price of this cement in its gross sales for income-tax purposes. It is a misconception to say that some of these items are "deductible." It is only necessary to eliminate the items from gross sales to settle the present controversy as to these items.

MARQUETTE agrees with this dissent.